588 So.2d 1282 (1991)
Lloyd TANNEHILL, Appellant,
v.
BROOKSHIRE GROCERY COMPANY, et al., Appellee.
No. 22873-CA.
Court of Appeal of Louisiana, Second Circuit.
October 30, 1991.
Rehearing Denied November 27, 1991.
Bruscato, Loomis, & Street by Anthony J. Bruscato, Monroe, for appellant.
Theus, Grisham, Davis & Leigh by James M. Edwards, Monroe, for appellee.
Before VICTORY, BROWN and STEWART, JJ.
VICTORY, Judge.
Plaintiff appeals a jury verdict rejecting his claim for damages against a supermarket as a result of a slip and fall occurring inside the store, near the entrance, on a rainy day. We affirm.

FACTS
On January 12, 1989, a rainy, winter day, Lloyd Tannehill, the 61 year old plaintiff, left his job cleaning drainage ditches for the City of Monroe at about 3:30 p.m. Stopping at Super 1 Foods (Brookshire's) to buy a single item, he entered the front door and saw someone at a distance that he thought he recognized. Not looking down, Tannehill walked across a floor mat measuring 3 feet by 10 feet and upon taking his first step off the mat and onto the vinyl floor, slipped and fell to the floor.
After presentation of the evidence, the jury affirmatively answered the following written interrogatories accompanying its verdict:
(1) Plaintiff fell and was hurt at defendant's store on January 12, 1989.
(2) Plaintiff proved by a preponderance of the evidence that he slipped and fell as a result of a hazardous condition which was present on the floor.
(3) Defendant proved by a preponderance of the evidence that it acted in a reasonably prudent manner in attempting to keep the floors free from hazardous substances.
*1283 Plaintiff contends on appeal that the jury was manifestly erroneous in concluding defendant proved by a preponderance of the evidence that it acted in a reasonably prudent manner in exercising its duty of care owed to plaintiff.

DISCUSSION
Because the plaintiff questions the sufficiency of the evidence offered by the defendant, we discuss the defendant's inspection and cleanup procedures in detail.
The written store policy, offered by the plaintiff as P-3, was Brookshire Store Policy Letter # 59 reproduced as follows:

ACCIDENT PREVENTION SAFETY RULES
A. SPILLS AND BREAKAGE
The first employee to find debris, breakage with glass and/or spills of any kind in the aisle should:
1. Call for someone to get the necessary tools to clean up the hazards. Do not leave the area until the hazard that is on the floor has been removed completely.
2. Immediately set up the Yellow Safety Signs provided at the end of each aisle, warning customers and employees alike, to be careful as they shop the aisle.
B. MOPPINGWET OR DAMP FLOORS
1. Place the Yellow Safety Signs in the area before you begin mopping.
2. After mopping, do not remove the signs until the floor is completely dry.
C. DEBRIS IN PRODUCE AISLES
1. Aisles must be inspected every 30 minutes.
2. Floors kept dry at all times and free of debris.
3. Displays of merchandise on floor should be in a safe manner where customers cannot stumble over them.
D. FLOOR INSPECTION LOG
1. Complete store floor inspection must be made six times per day.
2. A Floor Inspection Log must be completed by clocking the time of each inspection and initialed by the inspector.
3. The Store Director must sign the log verifying that each inspection was conducted.
4. The Floor Inspection Log should be sent in with weekly reports to be reviewed and filed with permanent records.
The procedures regarding inspection and cleanup at defendant's store were testified to by five store employees. The following exchange occurred with Gene Crim, the store manager:
Q. Have you ever had any discussions with any of the utility clerks, just tell them where to put [the wet floor signs] and how many to put out?
A. Yes sir.
[R.p. 221]
* * * * * *
Q. And then past the mat to the asbestos vinyl floor, what's the policy in mopping, do [the utility clerks] use their common sense or do you tell utility clerks how frequently to come check and mop?
A. Any utility clerk that's on duty, whether it be a rainy day or not a rainy day, but especially on a rainy day, knows what to do as far as that floor's concerned, however, we have a front end manager that ... we also have a mop bucket up front, on the front and any ... and on a rainy day it's almost a constant mopping that front, the front end manager, which is right there at all times, monitors that very, very closely.
[R.p. 222]
* * * * * *
Q. And what is the time frequency on any day for maintaining that floor area as far as mopping or cleaning that floor area at the front of the store?
A. You know, we constantly keep an eye on it, I'm not saying we're perfect and we're not going to keep every little speck off the floor, we're not going to *1284 do that, but I would say less than thirty minutes any time during the day, you know, because we've got a constant watch on it, but like I say, we're not going to catch everything, wish we could.
[R.p. 251]
* * * * * *
Q. Does that procedure change on a rainy day?
A. Well, yes, it does because on a rainy day, as many people as we have coming in and out, it's just ... it's almost a constant thing on a rainy day.
[R.p. 252]
The fall occurred at 3:45 p.m. Mr. Crim filled out an accident report on the spot while the plaintiff was sitting beside him. In the report, offered into evidence by the plaintiff as P-4, Crim stated that rugs (for use on rainy days) were down and "wet floor" signs were out. He specified that Norma Brezin, the front end manager, informed him of the fall, and that he inspected the area of the fall immediately, and noted the floor was clean, but damp. Further, he wrote that the schedule for cleaning the location was every 30 minutes or less on a rainy day, and that he had last inspected it 30 minutes prior to the fall.
Mr. Crim told the jury he had no independent memory of Tannehill's fall, but acknowledged that his handwriting appeared on the accident report, and stated he would not have inaccurately filled out the report:
Q. Is the accident report which has been labeled as P-4, does it contain accurate information?
A. This accident report is absolutely accurate, I would have no reason to put anything down that wasn't on there. If it's on here, under my testimony, I'll say it was correct and accurate.
[R.p. 247]
Norma Brezin, the store's front end manager and the first store employee to see plaintiff after he fell, described the same inspection and cleanup policies. She emphasized the additional duties placed on her on rainy days:
Q. Do you do anything differently on rainy days ... as far as monitoring the store?
A. Yes, I watch that front end because I don't want to have to go through something like this ... I'll watch it more closely.
[R.p. 270]
Although she could not remember the last time the floor was mopped prior to the fall, she remembered seeing wet floor signs and unequivocally expressed that on several occasions, of which only a sampling is reproduced here:
Q. Do you specifically recall any `wet floor' signs to the left by the buggies? I'm talking about the ... not what policy is, but do you have a specific recall of seeing a `wet floor' sign by the buggies to the left as you come in there?
A. I know we had signs there.
Q. Because that's policy?
A. Well, because it's policy and I do remember we had signs there.
Q. All right, now that's what I'm trying to get at, where you remembered seeing them, you specifically remember seeing one to the right?
A. I can't say exactly where they were but I do remember that we had them.
[R.p. 262-263]
* * * * * *
Q. What about on that day, do you recall there being that many signs or how many signs were there up?
A. It's company policy to put that many and we generally do. I can't swear, but I know that there were, you know, two or three.
[R.p. 272]
The utility clerks actually were responsible for the mopping and placing the signs out. On the day of the accident, the four utility clerks were: Kenneth Kendrix, Charles Arnold, Brodrick Sims and Willis Balsamo. Balsamo was unable to testify because he was at National Guard summer camp; however, the others were present at trial and testified.
*1285 Kendrix, who also had no recollection of the weather conditions or the fall itself, testified regarding the cleanup procedures as follows:
Q. Are utility clerks at your store taught in their procedure to take care of the floor of the store?
A. Yes sir.
Q. Is there any instruction given to the utility clerks during their employment by the management concerning keeping care of the front area, the entrance area of the store?
A. Yes sir.
Q. And is there any instruction with respect to taking care of the front area of the Super 1 store on rainy days?
A. Yes sir, we have `wet floor' signs, you know, up front where the service center was ... and still is.
Q. Is that taught to you that you are to put `wet floor' signs up on rainy days?
A. Yes sir.
Q. As a utility clerk, I mean?
A. Yes sir.
Q. Any other procedures taught to you as a utility clerk for rainy days at the entrances of the store?
A. We warn the customers. We have... you know, if there's water on the floor, we'll say, you know, watch your step, you know, it's verbally, you know, told.
Q. Do you ever mop the floor?
A. Oh, yes.
* * * * * *
Q. How often are the utility clerks or... well, you as a utility clerk, how often are you instructed to mop the floor on a rainy day?
A. On a rainy day?
Q. Yes.
A. We take special precautions on rainy days because of the front entrance, you know, you have to stay on top of it.
Q. Are you taught that from the beginning of your employment?
A. Yes sir.
Q. As the utility clerk during your employment tenure or the time you've been employed by Super 1, have you always followed store procedures with respect to the rainy day program?
A. I have.
* * * * * *
Q. How would you ... based on your own observations how would you rate the performance of the utility clerks and the persons in charge of the floor maintenance on rainy days?
A. I would say excellent.
[R.p. 279-281]
Arnold, one of the other utility clerks, was working close to the front entrance on the date in question. He recalled no specific facts about the fall, except that plaintiff was rubbing his shoulder and talking to Mr. Crim. However, he also described the store's cleanup procedures:
Q. Is there a procedure for utility clerks and front end managers with respect to the maintenance of the front area, the entrance area on rainy days?
A. Well, yes sir, what it is is that they'll post `wet floor' signs and right when you enter our store we have like a little gravel area kind of, it's not gravel, but it's a rough surface and behind that area will be carpet laid, sir, and then it's just a continual cleaning process throughout the day of trying to keep the floors as dry as possible with mops.
[R.p. 287]
Sims, who generally brought the carts in from the parking lot through the front door, stated if it was raining he would also mop after bringing in the carts. Although he also had no personal recollection of plaintiff's fall, he testified:
Q. Do you mop on rainy days, Mr. Sims?
A. Yes sir, I do.
Q. Okay. And is that a part of your duties on rainy days?
A. Yes sir.
Q. And do you put up `wet floor' signs on rainy days?
*1286 A. Yes sir.
[R.p. 297]
Plaintiff told the jury that from his position on the floor, there was dampness and it looked like there were small beads of water on the floor which might have been detergent. He testified that the same substance got on his hand, claiming that it felt like there was detergent in the water. However, in his own handwriting, the plaintiff gave his treating physician a history that the floor had just been mopped. When questioned on cross-examination he testified:
Q. So it was your assumption that based on what you had seen and observed when you were in the store on January 12th, it was your assumption that somebody had just mopped that floor?
A. Yes sir.
Q. So the floor was clean, was it not, as far as its appearance is concerned, it was clean?
A. Yes sir, it was.
[R.p. 168-169]
* * * * * *
Q. And you never told [Mr. Crim] anything about any substance or beads or soap or anything else being on that floor?
A. No sir.
Q. Didn't make any comments to him about the floor being too wet or being a problem at all, did you?
A. No sir.
[R.p. 170]
Plaintiff further testified:
Q. But you didn't even look to see if there was a `wet floor' sign or anything else out there?
A. No sir, it never occurred to me to look for it.
[R.p. 173]

LAW
The statute governing liability, LSA-R.S. 9:2800.6[1], is reproduced as follows:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a suit for damages by a person who has suffered damages as the result of a hazardous condition while on the merchant's premises, the person must prove that the accident was caused by a hazardous condition. The burden of proof then shifts to the merchant to prove that he acted in a reasonably prudent manner in exercising the duty of care he owed to the person to keep the premises free of any hazardous conditions.
C. In exculpating himself from liability under this Subsection, the merchant need not introduce the testimony of every employee of the merchant or any particular proportion thereof, but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition and those employees and management personnel whose job responsibilities included inspection or cleanup of the area where the accident giving rise to the damages occurred.
D. "Merchant" means one whose business is to sell goods, foods, wares or merchandise at a fixed place of business.
Thus, once the jury found plaintiff's fall was caused by a hazardous condition, the burden shifted to the store to establish that it acted in a reasonably prudent manner to keep the premises free of any hazardous condition.
There are several recent cases involving cleanup procedures inside a supermarket on rainy days. In Crandell v. Winn-Dixie Louisiana, Inc., 580 So.2d 967 (La.App. 5th Cir.1991), on a rainy day, plaintiff was attempting to get a shopping cart when she *1287 slipped and fell. One employee testified the floor was damp, but there was no puddles, while two employees testified the floor was completely dry and noted there were wet floor signs and mats down, one of whom had inspected the floor only five minutes before the accident. Periodic inspections for water puddles were made, although not on any preset schedule, and the store's rainy day policy was to put out mats and warning signs, to place an employee near the front to mop and warn customers, and to leave the wet carts outside to drip dry before bringing them in. The trial court held, and the Court of Appeal affirmed, that the store had carried its burden of proving it acted reasonably in protecting its customers.
In Stockwell v. Great Atlantic & Pacific Tea Company, 583 So.2d 1186 (La.App. 1st Cir.1991), it was undisputed that it had been raining when plaintiff entered the foyer of the store and fell on water that had accumulated there. The burden then shifted to the store to exculpate itself from liability. The store showed that it kept two floor mats in the foyer, that a mop bucket with a wet floor sign was placed near the area, and that the floor was mopped about once per hour just after the buggies were retrieved from the parking lot. There was no designated person to mop the floor, but it was standard operating procedure for the floor to be mopped by the person retrieving the buggies. The court held that under these facts the defendant maintained the foyer in a reasonably safe condition.
In Hall v. Kroger Co., 499 So.2d 469 (La.App.2d Cir.1986), it had been raining for some time when plaintiff entered the store. Plaintiff stated that just inside the entrance she slipped on water that had accumulated on the floor, and that she observed no warning signs. A store employee described the floor as "damp" but with no puddles. The employee further stated that employees had been instructed to mop the floor frequently because of rain being tracked in by customers, and that several orange cones with caution signs had been placed near the entry. The trial court found there was only a small amount of water on the floor, and that the defendant's actions were adequate to attempt to warn customers of the possibility of water on the floor and to remove it. This court affirmed, holding that no unreasonably dangerous condition existed and that even if it had, the defendant took proper steps to prevent the injury.
In Johnson v. Tayco Foods, 475 So.2d 65 (La.App.2d Cir.1985), writ denied, 478 So.2d 149, we recognized that a storekeeper is not responsible for keeping his store completely dry of tracked-in rainwater, and stated that each slip and fall case must be decided on its own circumstances. A store owner is not the insurer of the safety of his customers and is not required to keep the entryway, aisles and passageways in perfect condition. Stockwell v. Great Atlantic & Pacific Tea Company, supra.
In the instant case, several of defendant's employees testified what procedures and policies were being used to maintain the inside entrance area on a rainy day. Further, Ms. Brezin specifically remembered having placed the signs out on that particular day, a statement that was confirmed by the accident report. The plaintiff admitted he did not notice whether wet floor signs were out. Although Crim could not remember this specific accident, he indicated the store's procedure was not only to make a full store check six times every day, but also to inspect every 30 minutes and mop the entrance on good days and to mop almost constantly in rainy weather. Additionally, his accident report notes that the floor had in fact been cleaned some 30 minutes prior to the fall. He testified to the accuracy of his report.
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error. In applying the manifestly erroneous standard to a trial court's findings, appellate courts must constantly have in mind that their initial review is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses and the weight to be given to the evidence, the manifest error standard demands great deference to *1288 the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Although several of the defense witnesses could not recall plaintiff's fall, all testified to the store's cleanup procedures that were routinely followed on rainy days. The report prepared at the time of the fall verifies the entrance area was mopped 30 minutes prior to the fall. Plaintiff testified the floor had just been mopped and there was no standing water. Although the plaintiff testified he felt there may have been detergent on the floor, the jury could have reasonably accepted the testimony of defense witnesses that no soap, only tap water, was used to mop the floor. The store had warning signs posted. All of this considered, the jury's determination that defendant exculpated itself from liability was not manifestly erroneous and cannot be disturbed by this court.

DECREE
For the foregoing reasons, we affirm at the appellant's costs.
AFFIRMED.
BROWN, Judge, dissents.
Plaintiff entered defendant's store and proceeded to the right when he slipped and fell. The fall took place at least 24 feet inside the store and past floor mats placed at the entrance to prevent water from being tracked in. A jury correctly found that a hazardous condition existed inside defendant's store which caused plaintiff to fall and suffer injuries.
LSA-R.S. 9:2800.6[1] recognizes the duty owed by a storeowner to its customers to make a reasonable effort to keep its premises free from any hazardous condition. Pursuant to the statute, once plaintiff proved he fell due to a hazardous condition, the burden of proof then shifted to the storeowner to present evidence exculpating himself from the presumption of negligence. To overcome the presumption of negligence, the storeowner has a two-fold evidentiary burden of showing: 1) that none of his employees actually caused the hazard and 2) that he exercised reasonable care to prevent or correct hazardous conditions created by others. Marshall v. A & P Food Company, 587 So.2d 103 (La. App.2d Cir.1991).
The jury's verdict did not identify the source of the hazardous condition that caused plaintiff's fall. The only testimony about the condition of the floor was from plaintiff who indicated that it was "damp" with "some kind of water beads or something on the floor ... like there might have been soap or something like that". This testimony allows an inference of employee negligence. The statute specifically states that the merchant need not call every employee to testify "but is only required to introduce the testimony of any employee shown to have actually created the hazardous condition ..." None of defendant's employees had any recollection of whether or not they had worked in the area of the fall on the day of the accident. Defendant presented no evidence that the hazardous condition was not the result of employee negligence. While the statute lessens the extent of evidence required of a merchant, some evidence is still necessary. Marshall, supra.
The statute further states that the merchants must call "... those employees and management personnel whose job responsibilities included inspection or cleanup of the area ..." With the exception of Ms. Brezin, none of defendant's employees who testified had any personal knowledge of the accident or any specific maintenance actually conducted. Ms. Brezin did not witness the fall but did recall seeing plaintiff on the floor and contacted the store manager. Ms. Brezin did not inspect the area of the accident and left work 15 minutes after the fall. Ms. Brezin did believe "wet floor" *1289 signs were displayed but could not remember their exact location. Defendant's utility clerk, Brodrick Sims, although not recalling the events of this day, testified that he would normally put "wet floor" signs outside and by the shopping carts on rainy days. Plaintiff entered the store and went to the right while the shopping carts were located to the left. Plaintiff did not remember any "wet floor" signs.
An accident report completed by the store manager was used in the majority opinion to bolster defendant's lack of evidence. At trial the store manager had neither a refreshed nor independent memory of the accident. In elevating this accident report to the status of testimony, the majority opinion has denied plaintiff any right of cross-examination. Plaintiff's introduction of the report as an exhibit was simply to corroborate his testimony that the accident did happen.
Neither the initial investigation by the store manager nor a follow-up investigation on behalf of defendant by Northbrook Insurance Company attempted to determine what was done by defendant's employees on the day of the accident. Additionally, the store manager had available a video camera for the purpose of taping accident scenes but unexplainably it was not used.
At trial none of defendant's employees could remember specifically inspecting or cleaning up the area on this particular date and therefore no first-hand evidence existed to exculpate defendant from liability as required under LSA-R.S. 9:2800.6. Defendant did prove the store's maintenance and inspection policy but did not prove what actually occurred on the day of the accident. The testimony referred to in the majority opinion was all "lights and tinsel" with no substance. It would be incompatible with the legislative intent in enacting LSA-R.S. 9:2800.6 to allow defendant to exculpate itself by offering only evidence of its store policy. Otherwise, a merchant could avoid responsibility by a written document. What actually was done at the time of this accident is the proof intended by the statute. Therefore, there was no evidence to exculpate defendant and the jury's determination was legally wrong. Under these circumstances, I respectfully dissent.

APPLICATION FOR REHEARING
Before MARVIN, LINDSAY, VICTORY, BROWN and STEWART, JJ.
Rehearing denied.
NOTES
[1] This statute applies to all cases tried on or after July 18, 1988. Since then the statute has been changed significantly. However, the new statute is effective only to causes of action which arise on or after September 1, 1990.
[1] As in effect for this time period. As noted in the majority opinion, the statute was amended in 1990.